RECORD NO. 11-1723

# In The
# United States Court Of Appeals
# For The Fourth Circuit

SANDRA JIMENEZ, Individually and as Co-Personal Representative of the Estate of K.J.; JUSTINO JIMENEZ, Individually and as Co-Personal Representative of the Estate of K.J.

*Plaintiffs-Appellants*

v.

FREDERICK MEMORIAL HOSPITAL, INC.; FREDERICK MEMORIAL HEALTH CARE SYSTEM; ROBERT C. TALIAFERRO, PA-C; EMERGENCY PHYSICIAN ASSOCIATES, P.A.

*Defendants-Appellees*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND (NORTHERN DIVISION)

### BRIEF OF APPELLEES

M. Natalie McSherry
Mary Beth Ewen
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030

*Counsel for Appellees*
*Frederick Memorial Hospital, Inc., and*
*Frederick Memorial Health Care System*

Conrad W. Varner
Matthew H. Fogelson
Frederick W. Goundry, III
VARNER & GOUNDRY
121 East Patrick Street, Suite 100
Frederick, Maryland 21701
(301) 631-1800

*Counsel for Appellees*
*Robert C. Taliaferro, PA-C, and*
*Emergency Physician Associates, P.A.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 11-1723    Caption: Sandra Jimenez, et al. v. Frederick Memorial Hospital, Inc., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Frederick Memorial Hospital who is _____ Appellee _____ , makes the following disclosure:
(name of party/amicus)                (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
****************************

I certify that on ___ July 19, 2011 ___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Mary Beth Ewen                                          July 19, 2011
_____                            _____
(signature)                              i                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. <u>11-1723</u>    Caption: <u>Sandra Jimenez, et al. v. Frederick Memorial Hospital, Inc., et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Frederick Memorial Healthcare Systems</u> who is _____<u>Appellee</u>_____, makes the following disclosure:
(name of party/amicus)        (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO
2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
****************************

I certify that on <u>July 28, 2011</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

<u>/s/ Mary Beth Ewen</u>
(signature)

<u>July 28, 2011</u>
(date)

ii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. __11-1723__    Caption: _Sandra Jimenez, et al. v. Frederick Memorial Hospital, Inc., et al.___

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Emergency Physician Assoc._ who is _____appellee_____, makes the following disclosure:
(name of party/amicus)                (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☑ YES ☐ NO
    If yes, identify entity and nature of interest:
    Medical Mutual Liability Insurance Society of Maryland

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
*****************************

I certify that on ___July 26, 2011___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Thomas Carl Cardaro, Esq.
CARDARO & PEEK, LLC
201 N Charles Street
Baltimore, MD 21201

Natalie M. McSherry, Esq.
KRAMON & GRAHAM, PA
1 South Street, 26th Floor
Baltimore, MD 21202

/s/ Conrad W. Varner            iii            July 26, 2011
_____                          _____
(signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. __11-1723__    Caption: __Sandra Jimenez, et al. v. Frederick Memorial Hospital, Inc., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__R. Craig Taliaferro, PA-C__ who is __appellee__, makes the following disclosure:
(name of party/amicus)                (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☑ YES ☐ NO
    If yes, identify entity and nature of interest:
    Medical Mutual Liability Insurance Society of Maryland

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on ___July 26, 2011___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Thomas Carl Cardaro, Esq.
CARDARO & PEEK, LLC
201 N Charles Street
Baltimore, MD 21201

Natalie M. McSherry, Esq.
KRAMON & GRAHAM, PA
1 South Street, 26th Floor
Baltimore, MD 21202

__/s/ Conrad W. Varner__              iv              __July 26, 2011__
        (signature)                                        (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... vii

COUNTER-STATEMENT OF THE CASE ........................................... 1

COUNTER-STATEMENT OF THE FACTS ....................................... 4

SUMMARY OF THE ARGUMENT ................................................... 11

I.  The District Court Properly Granted Frederick Memorial's Motion For Summary Judgment As To Count III Of The Complaint ....................................................................................... 15

    A.  Standard of Review ............................................................... 15

    B.  Standard for a claim under EMTALA's failure to screen provision ............................................................................... 16

II.  The District Court Properly Found That There Is Insufficient Evidence That Frederick Memorial Deviated From The Standard Screening Procedures Applied To Patients Presenting With Symptoms Similar To Those Of K.J. ....................................... 20

    A.  Nurse Duhan evaluated K.J. in compliance with Frederick Memorial's standard screening procedure ............... 21

    B.  Frederick Memorial's standard screening procedure did not require Nurse Mattiello to reassess K.J.'s vital signs before she was discharged from the Emergency Department. ............................................................................ 26

    C.  Frederick Memorial's standard screening procedure did not require greater involvement by Dr. Villarosa. .................. 28

    D.  Frederick Memorial's standard screening procedure did not require that the Hospital provide Mrs. Jimenez with

an interpreter during K.J.'s medical screening. ........................ 30

E.    Frederick Memorial's standard screening procedure did
not require that the Hospital provide Mrs. Jimenez with
discharge instructions in Spanish. ............................................ 32

CONCLUSION ........................................................................................ 34

STATEMENT WITH RESPECT TO ORAL ARGUMENT ................................. 35

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)................................. 36

CERTIFICATE OF SERVICE......................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ...................................................................... 16

*Baber v. Hosp. Corp. of Am.,*
 977 F.2d 872 (4th Cir. 1992) ............................................. 18, 19, 20

*Bergwall v. MGH Health Servs., Inc.,*
 243 F. Supp. 2d 364 (D. Md. 2002) .......................... 16, 17, 18, 19

*Brooks v. Maryland Gen. Hosp., Inc.,*
 996 F.2d 708 (4th Cir. 1993) ....................................................... 17

*Bryan v. Rectors & Visitors of Univ. of Virginia,*
 95 F.3d 349 (4th Cir. 1996) .......................................................... 18

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ...................................................................... 15

*Feighery v. York Hosp.,*
 59 F. Supp. 2d 96 (D. Me. 1999) ................................................. 33

*Guzman v. Mem'l Hermann Hosp. Sys.,*
 637 F. Supp. 2d 464 (S.D. Tex. 2009), *aff'd* 409 Fed.
 Appx. 769 (5th Cir. Feb. 1, 2011) (unreported) ........................... 33

*Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.,*
 6 F.3d 211 (4th Cir. 1993) ............................................................ 15

*In the Matter of Baby K,*
 16 F.3d 590 (4th Cir. 1994) .......................................................... 17

*Magruder v. Jasper County Hospital,*
 243 F. Supp. 2d 886 (N.D. Ind. 2003) .................................... 24, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

475 U.S. 574 (1986) ........................................................................... 16

*Motor Club of Am. Ins. Co. v. Hanifi*,
145 F.3d 170 (4th Cir. 1998) ......................................................... 16

*Power v. Arlington Hosp. Ass'n*,
42 F.3d 851 (4th Cir. 1994) .............................................. 17, 19, 20

*Repp v. Anadarko Mun. Hosp.*,
43 F.3d 519 (10th Cir. 1994) .................................................. 24, 25

*Slabik v. Sorrentino*,
891 F. Supp. 235 (E.D. Pa. 1995), *aff'd* 82 F.3d 406 (3d
Cir. 2006) (unreported) ..................................................... 33

*Strag v. Bd. of Trustees*,
55 F.3d 943 (4th Cir. 1995) ............................................................ 16

*Tank v. Chronister*,
941 F. Supp. 969 (D. Kan. 1996) .................................................. 25

*Vickers v. Nash Gen. Hosp., Inc.*,
78 F.3d 139 (4th Cir. 1996) ........................................................... 18

## **STATUTE**

42 U.S.C. § 1395dd ............................................................... 1, 17, 19

## ISSUE PRESENTED FOR REVIEW

Whether the district court properly granted Frederick Memorial Hospital, Inc.'s and Frederick Memorial Healthcare System's Renewed Motion for Summary Judgment as to Count III of the Complaint, based on its determination that there was no evidence to support a finding, pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(a), that the minor patient, K.J., received a disparate medical screening at the hospital's emergency department on June 27, 2008.

## COUNTER-STATEMENT OF THE CASE

Appellants Sandra and Justino Jimenez filed a three-count complaint in the United States District Court for the District of Maryland on August 18, 2009, against Appellees Frederick Memorial Hospital, Inc., Frederick Memorial Healthcare System (collectively, "Frederick Memorial"),  Robert C. Taliaferro, PA-C, and Emergency Physician Associates, P.A.  In addition to asserting state law claims for wrongful death (Count I) and negligence (Count II), Appellants allege that Frederick Memorial violated EMTALA (Count III).  Only the EMTALA claim is relevant to this appeal.

Appellants' EMTALA claim is based on their contention that K.J. was denied an "appropriate medical screening examination" as required by 42 U.S.C. § 1395dd(a) on June 27, 2008, when K.J. presented to Frederick Memorial

complaining of injuries sustained from a bicycle accident. Specifically, Appellants allege in their complaint that Frederick Memorial:

> failed to undress and place K.J. in a hospital gown; failed to administer a complete and thorough physical examination of K.J.; failed to have a physician administer a physical examination of K.J.; failed to utilize a Spanish-speaking interpreter throughout the medical screening of K.J.; failed to appropriately obtain and document K.J.'s complete medical history and clinical findings; and otherwise failed to uniformly apply its medical screening procedure(s) to K.J.

Joint Appendix ("Joint Appx.") at 17.

On September 29, 2009, Frederick Memorial filed a motion to dismiss, or in the alternative motion for summary judgment as to the EMTALA claim. Joint Appx. at 3. Although the district court denied Frederick Memorial's initial motion, finding that the allegations contained in the complaint were sufficient to state a colorable claim under EMTALA, and permitting the parties to engage in discovery, it cautioned that it would "make a determination in light of the evidence whether Plaintiffs will be able to prove − not merely make plausible allegations regarding − their EMTALA claims." Joint Appx. at 158.

On January 4, 2011, after discovery had concluded, Frederick Memorial renewed its motion for partial summary judgment. Joint Appx. at 5. On June 6, 2011, the district court granted Frederick Memorial's motion for summary judgment as to the EMTALA claim and declined to exercise supplemental

jurisdiction over the remaining state law claims. Joint Appx. at 153-54. In granting Frederick Memorial's motion, the court recognized that EMTALA is limited in scope, requiring only that a patient receive the same screening examination that the hospital regularly provides to other patients in similar circumstances. The court also emphasized that EMTALA is not a federal medical malpractice statute.

Appellants argued that a physician should have been more involved in K.J.'s examination; that K.J. should have been placed in a hospital gown; that her vitals should have been rechecked before her discharge; that her mother should have been provided discharge instructions in Spanish; and that one of the three nurses who evaluated K.J. should have conducted a more thorough examination. The court correctly determined that there was no evidence that any such requirements were part of Frederick Memorial's standard screening procedure. Additionally, regarding Appellants' claim that Frederick Memorial violated EMTALA by not providing K.J.'s mother with an interpreter, the court properly found that there was no evidence that K.J. sustained any harm as a result of her mother not being provided with an interpreter.

On appeal, Appellants have abandoned their argument that Frederick Memorial violated EMTALA by not placing K.J. in a hospital gown. They argue, however, that the district court erred in finding that there was insufficient evidence

to support the other alleged EMTALA violations. In doing so, they ignore the undisputed evidence relied on by the district court in concluding that K.J. received the same screening examination Frederick Memorial would have provided to other patients presenting with the same history, symptoms, and findings.

## COUNTER-STATEMENT OF THE FACTS

K.J. presented to Frederick Memorial's Emergency Department on June 27, 2008, complaining that she sustained lacerations on her head and hand due to a bicycle accident. Joint Appx. at 50. At that time, Frederick Memorial provided that all patients presenting to the Emergency Department would be assessed initially in triage, pursuant to Frederick Memorial's Triage Policy. Joint Appx. at 107-109. The Triage Policy provided that, in triage:

- "Each patient will be assigned a triage category based on the assessment of the patient's need for medical attention."
- "Vital signs are taken, which include temperature, pulse, respiratory rate, and pulse ox when appropriate."
- "A rectal temperature will be taken on all children with a non-traumatic medical complaint under 4 years of age."
- "Blood pressure will be taken on all children over 4 years of age."
- "All patients will be weighed in kilograms."
- "The intake/triage RN or the TAG tech will initiate first aid measures in triage, which include but are not limited to dressing of wounds, immobilization, application of ice, elevation of soft issue injuries, wheelchair transport for lower extremity injuries, and stretcher transport for safety or comfort."

Joint Appx. at 107-08.

K.J. told the triage nurse, Shanda Ferguson, R.N. ("Nurse Ferguson"), that

she was riding her bike and fell on something metal, causing her to cut her right hand and the right side of her head.  Joint Appx. at 50.  K.J. appeared to Nurse Ferguson to be "fine" and in no distress.  Supplemental Appendix ("Supp. Appx.") at 9.  In fact, during triage K.J. was smiling and laughing, along with her brother, Eric, and her mother, Mrs. Jimenez.  Supp. Appx. at 21.  Nurse Ferguson, who was fluent in Spanish, spoke to Mrs. Jimenez in Spanish about K.J.'s accident.  Joint Appx. at 68.  Mrs. Jimenez said she did not witness the accident.  Joint Appx. at 68-69.  Nurse Ferguson did not feel that she needed an interpreter to communicate with Mrs. Jimenez.  Supp. Appx. at 32.

Nurse Ferguson took K.J.'s vital signs and recorded that her pulse was 134, her temperature was 98.5, her blood pressure was 121/75, her respiratory rate was 18, and her pulse ox was 98%.  Joint Appx. at 50.  Nurse Ferguson recorded K.J.'s weight to be 30.7 kilograms.  Joint Appx. at 50.  Nurse Ferguson noted that K.J. did not have any allergies.  Joint Appx. at 49.  After completing her assessment, Nurse Ferguson assigned K.J. a priority level of 4 and referred her to the "Fast Track" section of the Emergency Department.  Supp. Appx. at 3, 4.  Appellants do not argue that Nurse Ferguson's assessment of K.J. violated Frederick Memorial's standard screening procedure.

The "Fast Track" section is a treatment area for patients suffering from minor or non-urgent injuries.  Joint Appx. at 70-71.  Frederick Memorial had a Fast

Track Policy in place on June 27, 2008. Joint Appx. at 70-71. According to the Fast Track Policy, it was appropriate to refer a patient presenting with complaints of lacerations to the Fast Track area for evaluation. Joint Appx. at 71. The Fast Track Policy provided that, when a patient was referred to the Fast Track area, a registered nurse was required to "perform assessment and document symptoms related to patient complaints, pain, and psychosocial needs throughout the ED stay." Joint Appx. at 70. The nurse was also required to "perform treatments and procedures as ordered by the PA, administer medications, monitor, evaluate, and assist in performing treatments and tasks delegated to the ED technician, and provide verbal and written discharge instructions written by the PA/MD." Joint Appx. at 70.

Moreover, under the Fast Track policy, the patient was to be examined by a physician's assistant who would "order treatments, prescribe medication and designate discharge under the guidance of the emergency physician on duty." Joint Appx. at 70. If a patient was examined by a physician's assistant in the Fast Track area, the supervising physician was required to review and sign the patient's chart at some point during the physician's shift. Supp. Appx. at 142. The physician's assistant was not required to check with the supervising physician before deciding to discharge the patient. Supp. Appx. at 66, 143, 144, 146.

Once in Fast Track, K.J. was evaluated by two registered nurses, Stephanie

Duhan, R.N. ("Nurse Duhan"), and Sandra Mattiello, R.N. ("Nurse Mattiello"), as well as by a physician's assistant, Robert C. Taliaferro, PA-C ("P.A. Taliaferro"). Nurse Duhan examined K.J. in accordance with the multi-system assessment form, which was used for every patient. Supp. Appx. at 54. Nurse Duhan was aware that K.J. had a laceration on her hand and she asked K.J. if she was in pain either on her hand or in any other area of her body, to which K.J. answered in the negative. Supp. Appx. at 55. Because K.J. reported that she had a bicycle accident, Nurse Duhan wanted to make sure that K.J. had not lost consciousness. Supp. Appx. at 50. Nurse Duhan asked K.J. if she had passed out, and K.J. replied that she had not. Supp. Appx. at 46.

Nurse Duhan did not perform a cardiac, circulatory, neurological, respiratory or gastrointestinal assessment because K.J. did not complain of any symptoms relating to those systems. Joint Appx. at 88; Supp. Appx. at 58-59. Nurse Duhan explained that in Fast Track, the nurse's examination is specific to the patient's complaint, and it is the physician's assistant who performs a head-to-toe assessment of the patient. Joint Appx. at 88; Supp. Appx. at 62. Nurse Duhan's testimony is consistent with the plain language of the Fast Track policy, which requires the nurses in Fast Track to "perform assessment and document symptoms **related to patient complaints**, pain, and psychosocial needs throughout the ED stay." Joint Appx. at 70 (emphasis added).

P.A. Taliaferro also evaluated K.J.  The Fast Track Policy required P.A. Taliaferro to examine K.J. and, based on the results of his examination, to order treatments, prescribe medication, and designate discharge as appropriate.  Joint Appx. at 70.  P.A. Taliaferro reviewed K.J.'s vital signs and noted that she was tachycardic, i.e., she had an elevated pulse rate.  Supp. Appx. at 94.  He attributed her fast pulse to her being scared and nervous.  Supp. Appx. at 94-95.  K.J.'s other vital signs were normal.  Supp. Appx. at 94-95.  P.A. Taliaferro charted that K.J. denied nausea and vomiting, and denied blurry or double vision.  Supp. Appx. at 81-82.  He examined K.J.'s eyes and recorded that her pupils were reactive to light and her EOMs were normal.  Supp. Appx. at 82.  He also checked K.J.'s breathing and noted that she did not have any shortness of breath.  Supp. Appx. at 93.  P.A. Taliaferro observed K.J.'s gait and charted that it was normal.  Supp. Appx. at 105.

P.A. Taliaferro also performed a physical examination.  Supp. Appx. at 73, 97-101.  Specifically, he asked K.J. if she felt any pain as he palpated her head, neck, chest, stomach, hips, legs, and arms.  Supp. Appx. at 73, 97-101.  P.A. Taliaferro testified that he normally performs an abdominal examination by pushing in the upper quadrants and in the epigastric area to make sure there is no pain.  Supp. Appx. at 73, 97-101.  He then moves to the middle of the abdomen and does the same, and finally he moves to the lower abdomen.  Supp. Appx. at 97-99.  He also checks both CVA areas.  Supp. Appx. at 97.  K.J. did not report

any pain during the abdominal examination. Supp. Appx. at 97. P.A. Taliaferro listened to K.J.'s bowels using a stethoscope and charted that K.J.'s bowel sounds were positive. Supp. Appx. at 102. According to P.A. Taliaferro, K.J.'s abdominal examination was benign. Supp. Appx. at 99.

After examining K.J. for any other injuries, P.A. Taliaferro focused on K.J.'s head and hand lacerations. Supp. Appx. at 108. Specifically, he examined her lacerations to see if he could "elicit any pain or a depression or anything that is out of the ordinary." Supp. Appx. at 108. Regarding her head laceration, he "examine[d] circumferentially around palpating down and see if [he could] elicit any tenderness or any deformity or stepoff." Supp. Appx. at 109. P.A. Taliaferro observed that K.J. was tender directly over the cut, but below the cut she was not. Supp. Appx. at 109. After P.A. Taliaferro used Lidocaine to numb the head laceration, he pulled the edges apart and looked to see how deep it was and also looked to see if there were any foreign bodies present. Supp. Appx. at 110. He was not able to palpate a stepoff.[1] Supp. Appx. at 113. Based on the results of his examination and K.J.'s lack of pain, P.A. Taliaferro did not believe she had a skull fracture. Supp. Appx. at 114-15. P.A. Taliaferro determined that after her lacerations were sutured, K.J. would be ready to be discharged from the

---

[1]    A "stepoff" is an indentation in the bone of the scalp that might indicate a fracture.

Emergency Department.  Supp. Appx. at 122.

Nurse Mattiello handled the discharge of K.J.  Joint Appx. at 121.  When asked by Nurse Mattiello if she was in any pain, K.J. responded in the negative. Joint Appx. at 121-22, 128.  Supp. Appx. at 124.  According to Nurse Mattiello, K.J. appeared to be "pain-free."  Supp. Appx. at 124.  Nurse Mattiello noted that a patient's vital signs are generally only rechecked before discharge if the patient has received medication.  Joint Appx. at 121-22; Supp. Appx. at 127.  Because K.J. did not receive medication, Nurse Mattiello did not recheck K.J.'s vital signs.  Supp. Appx. at 125-26.

After checking on K.J., Nurse Mattiello provided Mrs. Jimenez with discharge instructions.  Joint Appx. at 122.  Mrs. Jimenez indicated to Nurse Mattiello that she understood the discharge instructions and she signed the discharge paperwork.  Joint Appx. at 122-25; Supp. Appx. at 128, 134.  Nurse Mattiello also orally told Mrs. Jimenez to keep the area around the laceration clean and dry, and to monitor for symptoms of infection.  Supp. Appx. at 129, 132.  She told Mrs. Jimenez that if K.J. developed a fever or any drainage to use gentle soap and water to wash the area.  Supp. Appx. at 129, 133.  Nurse Mattiello told Mrs. Jimenez that, if K.J. experienced any pain, she should give her Tylenol or Motrin as needed.  Supp. Appx. at 129, 131, 139.  Finally, Nurse Mattiello told Mrs. Jimenez that if K.J. experienced any headache, weakness or vomiting, she should

return to the emergency room.  Supp. Appx. 129-30.

## SUMMARY OF THE ARGUMENT

The undisputed evidence in this case shows that, when K.J. presented to the Frederick Memorial Emergency Department on June 27, 2008, she received a standard screening examination as required by EMTALA.  EMTALA is limited in scope and is not intended to be a federal medical malpractice statute.  Accordingly, as recognized by the district court, whether K.J. was misdiagnosed or whether Frederick Memorial's standard screening procedure was inadequate are issues relevant only to Appellants' state malpractice claims.  To defeat a motion for summary judgment as to the EMTALA claim, Appellants were required to show that Frederick Memorial failed to provide K.J. with the same screening procedure it would provide to any other patient presenting with K.J.'s symptoms.  As long as the same procedure was followed, Frederick Memorial complied with its obligations under EMTALA.

On appeal, Appellants argue that Frederick Memorial violated EMTALA's screening requirement in the following ways: (1) Nurse Duhan did not conduct an "in-depth" examination of K.J.; (2) Mrs. Jimenez was not provided with an interpreter during K.J.'s screening examination; (3) P.A. Taliaferro did not consult with the supervising physician, Albert Villarosa, M.D. ("Dr. Villarosa"), before discharging K.J.; (4) Nurse Mattiello did not recheck K.J.'s vital signs before she

was discharged; and (5) Mrs. Jimenez was not given discharge instructions in Spanish. The district court correctly determined, however, that Appellants offered no evidence to support a finding that these alleged violations were sufficient to sustain an EMTALA claim.

Regarding Nurse Duhan's evaluation of K.J., the undisputed evidence shows that Frederick Memorial requires nurses who examine Fast Track patients to conduct a focused examination, based only on the patient's complaints and symptoms. Appellants take issue with the fact that Nurse Duhan did not examine K.J.'s neurological, gastrointestinal, respiratory or circulatory systems, but it is undisputed that K.J. did not voice any complaints relating to those systems.

Although Appellants make much of the fact that Mrs. Jimenez was not provided with an interpreter during K.J.'s screening examination, they mischaracterize the evidence below in arguing that this was a violation of EMTALA. Specifically, they allege that Mrs. Jimenez was unable to inform the health care providers that K.J. was not wearing a helmet during the bicycle accident. According to Appellants, if such information had been made known to the health care providers, K.J. would have received additional testing that would have revealed she was suffering from an emergency medical condition. P.A. Taliaferro and Nurse Ferguson both testified, however, that they *were aware* K.J. was not wearing a helmet because either K.J. and/or her brother told them this

information during K.J.'s examination. Moreover, it is undisputed that Nurse Ferguson, the triage nurse, spoke fluent Spanish and was able to communicate with Mrs. Jimenez during K.J.'s triage examination. There is no evidence that providing an interpreter to Mrs. Jimenez during the exam would have led to a different evaluation.

As for the lack of physician involvement in K.J.'s screening examination, Dr. Villarosa, P.A. Taliaferro, and Nurse Duhan all testified that hospital policy only required the physician's assistant to review a patient's chart with the physician on duty before the end of the physician's assistant's shift. Appellants do not dispute that P.A. Taliaferro provided Dr. Villarosa with K.J.'s chart before the end of his shift and that Dr. Villarosa signed off on the chart. Appellants' conclusory allegation that Frederick Memorial's screening procedure required Dr. Villarosa to be more involved with K.J.'s evaluation is simply not supported, and actually contradicted, by the evidence.

Appellants' allegation that Nurse Mattiello violated EMTALA by not rechecking K.J.'s vital signs is similarly unfounded. The written hospital policies applicable to Fast Track patients do not require that a patient's vital signs be rechecked before the patient is discharged from the Emergency Department. Nurse Mattiello testified that the usual practice was generally only to recheck a patient's vital signs if the patient received medication. Although K.J. was administered

Lidocaine (a local anesthetic) when her lacerations were sutured, the district court correctly noted that there was no evidence that Nurse Mattiello was aware that K.J. received Lidocaine nor any evidence that she considered the local anesthetic to be a "medication" for purposes of rechecking vital signs.

Appellants also argue that Mrs. Jimenez should have been given written and oral discharge instructions in Spanish. Even if Mrs. Jimenez was not given discharge instructions in Spanish (which Frederick Memorial disputes), the district court properly noted that discharge instructions are not part of Frederick Memorial's screening examination. By the time that Mrs. Jimenez was given discharge instructions (whether in English or in Spanish), P.A. Taliaferro had already determined that K.J. was not suffering from an emergency medical condition. Accordingly, as noted by the district court, this alleged failure by the health care providers cannot give rise to an EMTALA claim.

In their brief, Appellants take issue with the adequacy of Frederick Memorial's standard screening examination, and stress that K.J. was allegedly misdiagnosed by the health care providers. These issues, however, are irrelevant to an EMTALA claim. An EMTALA claim in this setting is limited to whether Frederick Memorial screened K.J. the same way it would another patient with her symptoms. Once the Hospital provided a standard screening to K.J. and the health care providers made the determination that she was not suffering from an

emergency medical examination, the screening obligations under EMTALA were satisfied. Accordingly, this Court should affirm the district court's decision to enter summary judgment in favor of Frederick Memorial as to Appellants' EMTALA claim.

## **ARGUMENT**

I. **The District Court Properly Granted Frederick Memorial's Motion For Summary Judgment As To Count III Of The Complaint.**

   A. **Standard of Review**

The district court's decision to grant Frederick Memorial's Renewed Motion for Summary Judgment as to Count III of the Complaint was based on its finding that, as a matter of law, there was no evidence to support Appellants' claim that K.J. received a disparate screening examination at Frederick Memorial's Emergency Department on June 27, 2008. A district court's decision on a motion for summary judgment is reviewed *de novo. Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993).

Summary judgment is appropriate where a plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The burden on the moving party may be discharged by a 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Bergwall v. MGH Health Servs.*,

*Inc.*, 243 F. Supp. 2d 364, 369 (D. Md. 2002) (quoting *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 174 (4th Cir. 1998)). "Once the moving party has met this burden, the burden of production shifts to the nonmoving party who 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

"The nonmoving party 'may not rest upon the mere allegations or denials of the adverse party's pleading' (Fed. R. Civ. P. 56(e)), but must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita*, 475 U.S. at 587). "A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party." *Id.* Failure to demonstrate a genuine issue for trial will result in summary judgment. *Strag v. Bd. of Trustees*, 55 F.3d 943, 951 (4th Cir. 1995). The mere existence of a scintilla of evidence in support of a plaintiff's case is insufficient; there must be evidence on which a jury can reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## B.   Standard for a claim under EMTALA's failure to screen provision

EMTALA was enacted by Congress in 1986 "to address a growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency

conditions were stabilized." *Bergwall*, 243 F. Supp. 2d at 370 (quoting authority omitted); *see also Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993). Accordingly, under EMTALA, when an individual seeks medical treatment at a hospital's emergency department, the hospital must provide an "appropriate medical screening examination" within the capability of the hospital's emergency department to determine whether an "emergency medical condition" exists. 42 U.S.C. § 1395dd(a).

"EMTALA does not define the phrase 'appropriate medical screening examination' other than to state that its purpose is to identify an 'emergency medical condition.'" *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994). In explaining what constitutes an "appropriate medical screening examination," this Court has held:

> The plain language of EMTALA requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints. The key requirement is that a hospital apply its standard of screening <u>uniformly</u> to all emergency room patients, regardless of whether they are insured or can pay. The Act does not impose any duty on a hospital requiring that the screening result in a correct diagnosis.

*Id.* (quoting authority omitted) (emphasis supplied); *see also In the Matter of Baby K*, 16 F.3d 590, 593 (4th Cir. 1994) (holding that a hospital fulfills its statutory duty under EMTALA to provide an appropriate medical screening exam "if [the

08391/2/01013515.DOCXv1                                    17

hospital] utilizes identical screening procedures for all patients complaining of the same condition or exhibiting the same symptoms").

It is well-established that the cause of action created by EMTALA is distinct and different in kind from a medical malpractice or negligence claim. *See, e.g.*, *Bryan v. Rectors & Visitors of Univ. of Virginia*, 95 F.3d 349, 351 (4th Cir. 1996) (EMTALA is "not a federal malpractice statute").  EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence. *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996); *see also Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) ("We reject [the] suggestion that failure to diagnose an emergency medical condition violates EMTALA.").

EMTALA recognizes that the resources and abilities of emergency departments vary from hospital to hospital and follows an individualized standard for each hospital, instead of applying a national or negligence standard. *Baber*, 977 F.2d at 879; *see also Bergwall*, 243 F. Supp. 2d at 371 ("The hospital's procedures need not be identical to what would be performed in other facilities, but rather are unique to each individual facility.").  A hospital may develop one general procedure for screening all emergency room patients, or it may "tailor its screening procedure to the patient's complaints or exhibited symptoms." *Id.*  A hospital "satisfies the requirements of § 1395dd(a) if its standard screening procedure is

applied uniformly to all patients in similar medical circumstances." *Id.* at 881.

The issue in an EMTALA case based on an alleged failure to provide an appropriate medical screening examination, therefore, is not whether the hospital's treatment was "adequate" as measured against a malpractice standard, but whether the patient received the same screening examination that the hospital regularly provides to other patients in similar circumstances. *See Power*, 42 F.3d at 859. Indeed, this Court has refused to allow a dispute of fact about the *adequacy* of a screening examination to defeat a motion for summary judgment:

> Although evidence challenging the adequacy of a screening examination may be sufficient to withstand summary judgment in a medical malpractice action, it is not sufficient to establish an EMTALA violation under § 1395dd(a). The critical element of an EMTALA claim is not the adequacy of the screening examination but whether the screening examination that was performed deviated from the hospital's evaluation procedures that would have been performed on any patient in a similar condition.

*Baber*, 977 F.2d at 881. Accordingly, "[s]o long as the hospital has offered an emergency patient all its standard medical screening procedures, once the emergency department staff has determined that an emergency medical condition is or is not present, its obligation under Section 13955dd(a) ends." *Bergwall*, 243 F. Supp. 2d at 371.

To defeat a motion for summary judgment as to a claim under 42 U.S.C. § 1395dd(a), therefore, a plaintiff must show there exists a genuine dispute as to

whether the patient received "disparate treatment."  *Baber*, 977 F.2d at 881; *see also Power*, 42 F.3d at 858 (The "threshold" requirement is "differential treatment," that the screening the hospital provided to the patient "deviated from [the screening] given to other patients.").  Only "*after* a plaintiff makes this threshold showing," does a defendant need to offer evidence "demonstrating that the patient was accorded the same level of treatment that all other patients receive." *Power*, 42 F.3d at 858 (emphasis added).

## II.  The District Court Properly Found That There Is Insufficient Evidence That Frederick Memorial Deviated From The Standard Screening Procedures Applied To Patients Presenting With Symptoms Similar To Those Of K.J.

Appellants allege that, in K.J.'s case, Frederick Memorial failed to apply its standard screening procedures uniformly in the following ways: [2]

1.   Nurse Duhan failed to perform an "in depth assessment" of K.J.;

2.   Nurse Mattiello failed to reassess K.J.'s vital signs before her discharge from the Emergency Department;

3.   P.A. Taliaferro failed to "consult" a physician during K.J.'s examination;

4.   Mrs. Jimenez was not provided with a Spanish-speaking interpreter during K.J.'s visit to the Emergency Department; and

---

[2]   Appellants argued in the district court that Frederick Memorial's standard screening procedure required that K.J. be undressed and placed in a hospital grown during her examination at the Emergency Department.  Appellants have not raised that argument on appeal, apparently conceding that the district court properly determined that there was no evidence to prove that this action was a part of Frederick Memorial's standard screening procedure.

5.    Mrs. Jimenez was not provided with discharge instructions in Spanish.

As discussed more fully below, the district court correctly determined that there was insufficient evidence to prove that Frederick Memorial's standard screening procedure required Nurse Duhan to perform a more "in depth" evaluation of K.J.; Nurse Mattiello to reassess K.J.'s vital signs upon discharge; Nurse Mattiello to provide Mrs. Jimenez with discharge instructions in Spanish; or P.A. Taliaferro to consult with a physician before discharging K.J. from the Emergency Department.  Moreover, the district court properly found that, even if Frederick Memorial's standard screening procedure required Mrs. Jimenez to be provided with an interpreter during K.J.'s screening examination (which it did not), there is no evidence that K.J. sustained any harm as a result of this alleged failure.

### A.    Nurse Duhan evaluated K.J. in compliance with Frederick Memorial's standard screening procedure.

Appellants argue that Nurse Duhan failed to perform an "in depth assessment" of K.J. as required by the Nursing Assessment Policy.  Brief at 16.  Specifically, Appellants argue that Nurse Duhan violated Frederick Memorial's standard screening procedure because she did not evaluate K.J.'s neurological, gastrointestinal, respiratory or circulatory systems.  Brief at 16.

The undisputed evidence shows, however, that Nurse Duhan's evaluation of K.J. was required to be specific to K.J.'s complaints.  Because K.J. did not

08391/2/01013515.DOCXv1                    21

complain of neurological, gastrointestinal, respiratory or circulation symptoms,

Nurse Duhan was not required by hospital procedure to evaluate those systems.

Supp. Appx. at 59-60, 62.  As recognized by the district court,

> The Fast Track Policy provides that "[t]he RN will perform assessment and document symptoms related to patient complaints, pain, and psychosocial needs throughout the ED stay."  In her deposition, Nurse Duhan testified that in the Fast Track, the nurse examines the patient in a way "specific to what the complaint is." Nurse Duhan testified that the physician's assistant always performs a "full assessment" on all patients, but the nurse only examines what hurts, which as to [K.J.], Nurse Duhan perceived to be [K.J.'s] hand.

> FMH maintains a written Nursing Assessment Policy for the purpose of providing standards for nursing assessment and reassessment in each department of the hospital. The Nursing Assessment Policy states,

>> Initial Assessment: The triage assessment is performed upon arrival to Emergency Department and according to ED policies. A complete assessment is performed when the patient is placed in the main ED bed according to determined priority and ED policies, but minimally within 2 hours of admission.

> A complete assessment is defined in the Nursing Assessment document as a review of body systems, including neurological and gastrointestinal.

> There is no evidence adequate to establish a policy requiring that a nurse in the Fast Track area of the emergency department perform a "complete assessment" of a Fast Track patient presenting symptoms similar to those perceived to be suffered by [K.J.].  Both the Fast

Track Policy and the deposition testimony of Nurse Duhan confirm that the general screening examination of a nurse in the Fast Track area is focused or specific to the patient's complaints.

Although it appears the FMH's Nursing Assessment Policy is applicable to nurses in the emergency department for purposes of EMTALA, its plain language does not require such nurses to perform "complete assessments" on Fast Track Patients. The "POLICY" portion of the document contains numbered paragraphs that define a nurse's responsibilities when performing initial assessments and reassessments. Concerning initial assessments in the emergency department, after the patient is assessed at arrival:

A more in depth assessment is obtained once the patient has been received into the treatment or main area of the Emergency Department.

In the definition section of the document, a reassessment is defined as one that may be a complete or focused assessment. The definition of initial assessment does not refer to a complete assessment.

Indeed, the Nursing Assessment Policy operates in conjunction with, not opposition to, the Fast Track and Triage Policies. As explained herein, the Fast Track Policy does not require a nurse to perform a complete assessment on a Fast Track Patient. Consequently, the Nursing Assessment Policy does not expressly require a nurse to perform a complete assessment of every Fast Track patient in the emergency department.

Joint Appx. at 174-76 (internal citations omitted).

Accordingly, the district court properly found that Appellants "have not

presented evidence sufficient to establish the screening examination K.J. received

from Nurse Duhan in the Fast Track area of the emergency department differed from the type of screening examination generally provided by FMH to patients presenting complaints similar to K.J."  Joint Appx. at 177.

Even if Frederick Memorial's screening policy had required Nurse Duhan to perform a "complete assessment" of K.J. (which it did not), her failure to perform such an assessment would amount to nothing more than a *de minimus* deviation from Hospital policy, not sufficient to form a basis for a claim under EMTALA. *See Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 523 (10th Cir. 1994) ("Mere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy.  To hold otherwise would impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed.").

The application of this principle is seen in *Magruder v. Jasper County Hospital*, 243 F. Supp. 2d 886 (N.D. Ind. 2003), where a nurse failed to weigh a child without his diaper, which constituted a violation of the hospital's screening policy.  *Id.* at 893.  The child's parents alleged that the failure to weigh the child without his diaper was significant under EMTALA because the nurse did not asses the child's groin area.  *Id.*  The Court found that the nurse's conduct was merely a *de minimus* deviation from the screening procedure because the physician who subsequently examined the child testified that he fully assessed the child's groin

area. *Id.*

*Magruder* is directly on point in this case because P.A. Taliaferro performed the assessments that Appellants complain were not performed by Nurse Duhan. Accordingly, even if the Hospital's screening policy in the Fast Track area of the Emergency Department required nurses to perform an assessment of the patient's neurological, gastrointestinal, respiratory, and circulatory systems regardless of the patient's symptoms (which it did not), the fact that Nurse Duhan did not conduct these assessments amounts to nothing more than a *de minimus* deviation. *See Repp*, 43 F.3d at 523 (finding that the nurses' failure to take a complete medical history and ask the patient for a list of his medications was a *de minimus* deviation from hospital policy because the patient's wife told the nurses the information relevant to her husband's medical history upon arrival at the hospital); *see also Tank v. Chronister*, 941 F. Supp. 969, 974 (D. Kan. 1996) (finding that the nurse's failure to recheck a patient's vital signs, although a technical violation of the hospital's screening policy, was a *de minimus* deviation because the hospital's policy was designed to exclude first false readings of a serious medical emergency and there was no evidence presented that the first readings were false).

Although Appellants clearly take issue with the adequacy of Nurse Duhan's examination, referring to it as a mere "three-minute encounter" (Brief at 16), whether the examination fell below the standard of care is an issue relevant only to

Appellants' state law claims.  Because the undisputed evidence establishes that
Nurse Duhan's focused examination was the same examination that would have
been provided to any other patient seen in Fast Track with K.J.'s symptoms, the
district court was correct in rejecting this as a proper basis for a claim of disparate
treatment under EMTALA.

> **B.    Frederick Memorial's standard screening procedure did not
> require Nurse Mattiello to reassess K.J.'s vital signs before she
> was discharged from the Emergency Department.**

According to Appellants, K.J. was not offered a standard screening
examination because Nurse Mattiello did not reassess K.J.'s vital signs at the time
of K.J.'s discharge.  However, Appellants fail to offer any evidence to support their
allegation that Frederick Memorial's standard screening procedure in June 2008
required a nurse to reassess a Fast Track patient's vital signs at discharge.  In fact,
there is no such requirement in the Fast Track Policy, Nursing Assessment Policy,
or any other hospital policy produced.  The Nursing Assessment Policy states that
reassessments in the emergency department "are based on the patient's condition,
treatments, and procedures implemented during the ED Visit."  Joint Appx. at 98.
The Policy further explains that a reassessment "may be complete or focused
assessment based on the patient's condition/diagnosis."  Joint Appx. at 98.
Moreover, as explained by Nurse Mattiello during her deposition, nurses do not
generally take a patient's vital signs at discharge in Fast Track unless the patient

has taken medication.  Joint Appx. at 121-22; Supp. Appx. at 127.

Appellants argue that K.J. was administered medication, Lidocaine, by P.A. Taliaferro during her Emergency Department visit.  As recognized by the district court, Appellants failed to "submit evidence establishing that Lidocaine is anything but a local anesthetic."  Joint Appx. at 178.  The district court further recognized:

> Nurse Mattiello testified that she did not take K.J.'s vitals because vitals are reasssessed only upon discharge if the patient had received medication.  Drawing all reasonable inferences in favor of Plaintiffs, Nurse Mattiello's statement, at most, indicates that either she did not consider Lidocaine to be a "received medication" or she did not know that K.J. had been administered Lidocaine.  Either way, while there may be a state law claim for inadequate treatment, there is no evidence of an EMTALA violation.

> If Nurse Mattiello did not consider Lidocaine to be a received medication, her actions did not deviate from the asserted standard screening procedure.  If Nurse Mattiello did not know K.J. had been administered Lidocaine and failed to take her vitals as a result, FMH would not have violated EMTALA.  *See Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 144 (4th Cir. 1996) ("[W]hen an exercise in medical judgment produces a given diagnosis, the decision to prescribe a treatment responding to the diagnosis cannot form the basis of an EMTALA claim of inappropriate screening.")

Joint Appx. at 179.

Appellants ignore the district court's reasoning and simply argue on appeal that because K.J. was administered a local anesthetic when she received stitches, she necessarily "received medication" and therefore Nurse Mattiello violated

EMTALA by not rechecking K.J.'s vital signs. They have produced no evidence that hospital policy required this to be done or that it was routinely done for other similarly situated patients. Appellants' conclusory argument fails for the reasons stated by the district court.

### C.     Frederick Memorial's standard screening procedure did not require greater involvement by Dr. Villarosa.

Appellants allege, that pursuant to Frederick Memorial's standard screening procedure, "a physician is required to provide guidance during the performance of patient examinations, including the determination of proposed treatment plans and designations for discharge." Brief at 18-19. Specifically, Appellants allege that the Fast Track Policy "necessarily required P.A. Taliaferro to seek guidance from a physician while [K.J.] was still present in the emergency department prior to discharge so that, *inter alia*, the decision to discharge could be changed if necessary." Brief at 19.

Contrary to Appellants' allegation, the Fast Track Policy cited by Appellants as support provides only that the emergency physician on duty will provide guidance to the physician's assistant on duty. Joint Appx. at 70. Moreover, the contract between the hospital and the physician group providing emergency services, also cited by Appellants, provides only that patients will be evaluated under the direction of the physician on duty. Joint Appx. at 139. As recognized by the district court:

Nurse Ferguson, Nurse Duhan, P.A. Taliaferro, and Dr. Villarosa testified in their depositions that, as to Fast Track patients, the role of the supervising physician typically consisted of reviewing and signing the charts of Fast Track patients examined by a physician's assistant or nurse practitioner at some point during the examiner's shift.

Specifically, P.A. Taliaferro testified in his deposition that a Fast Track patient's discharge was at his discretion and there were no circumstances when he was obligated to consult with a supervising physician before discharging a patient. P.A. Taliaferro also testified that his practice was to deliver the charts of patients he examined to the supervising physician to review and sign at some point before the physician's shift ended. The deposition testimony of Dr. Villarosa echoes P.A. Taliaferro's deposition testimony as to physician involvement with Fast Track patients.

\* \* \*

Although the written policies require a physician's assistant to operate under the guidance of the supervising physician, the policies do not detail when or how such supervision is to occur.

The uncontradicted deposition testimony of FMH emergency department personnel concerning the level of guidance and supervision as to Fast Track patients is consistent with the screening procedures offered to K.J. The supervising physician reviewed and signed K.J.'s chart in the presence of P.A. Taliaferro at some point during Taliaferro's shift. Whether this level of physician involvement as to Fast Track patients was adequate under state negligence or medical malpractice jurisprudence is a matter for debate in the context of Plaintiffs' state law claims but not the EMTALA claim.

Accordingly, Plaintiffs have failed to present

> evidence sufficient to establish that the involvement of
> the supervising physician in K.J.'s emergency department
> screening differed from the involvement of the
> supervising physician in the emergency department
> screening received by other Fast Track patients
> presenting similar symptoms.

Joint Appx. at 167-69 (internal citations omitted); *see also* Supp. Appx. at 2, 43, 65, 141-42, 145.

Appellants simply have failed to provide any evidence to support their allegation that direct physician involvement was required or even usual for a standard medical screening in a case such as this. Therefore, this allegation cannot sustain a claim for disparate screening.

### D.   Frederick Memorial's standard screening procedure did not require that the Hospital provide Mrs. Jimenez with an interpreter during K.J.'s medical screening.

Appellants' reliance on Frederick Memorial's communications policy to support their EMTALA claim is misplaced. Disregarding the fact that Mrs. Jimenez never asked for a translator (Supp. Appx. at 136), never told anyone that she could not read English (Supp. Appx. at 137), and never told anyone that she did not understand the discharge instructions (Supp. Appx. at 137-38), Appellants allege that "denying Mrs. Jimenez an interpreter resulted in the failure of the healthcare providers at FMH to obtain critical information relevant to the nature of [K.J.'s] head injury, including the fact that [K.J.] was not wearing a helmet at the time of her bicycle fall." Brief at 20. According to Appellants, "[s]uch critically

important medical history would have assisted the healthcare providers at FMH to detect, diagnose and treat [K.J.'s] head and abdominal injuries found at autopsy." Brief at 20.

Appellants' contention ignores the undisputed testimony of Nurse Ferguson and P.A. Taliaferro that they were aware, based on their conversations with K.J. and her brother, that K.J. was not wearing a helmet when she fell off her bicycle. Supp. Appx. at 23, 70. Moreover, as recognized by the district court, there is no evidence "that a language barrier prevented the dissemination of relevant information to the healthcare providers during K.J.'s screening." Joint Appx. at 181. Indeed, it is undisputed that the health care providers were able to communicate with K.J. to ascertain the history of her injury and the nature of her complaints, injuries, and symptoms. Supp. Appx. at 5-41, 44-53, 56-58, 64, 67-121. Without any evidence to show that the absence of an interpreter interfered with the health care providers' ability to provide K.J. with a standard screening examination, the fact that Mrs. Jimenez did not have an interpreter during the screening is irrelevant for purposes of Appellants' EMTALA claim. Accordingly, the district court properly found that there is no evidence that Appellants sustained any harm as a result of Mrs. Jimenez not being provided with an interpreter during K.J.'s standard screening examination.

E.   **Frederick Memorial's standard screening procedure did not
require that the Hospital provide Mrs. Jimenez with discharge
instructions in Spanish.**

Appellants' allegation that Frederick Memorial failed to provide Mrs.

Jimenez with written and verbal discharge instructions in Spanish provides no

basis for their EMTALA claim. The district court noted that, although "[i]t appears

that the United States Court of Appeals for the Fourth Circuit has not addressed the

question of whether an emergency department's procedures concerning the

provision of discharge instructions fall within a hospital's 'standard screening

procedures' for purposes of an EMTALA disparate treatment claim," the court did

not find the resolution of the issue doubtful. Joint Appx. at 183.

The district court recognized that "so long as the hospital has offered an

emergency patient all of its standard medical screening procedures, once the

emergency department staff has determined an emergency medical condition is or

is not present, its obligation under Section 1395dd(a) ends," and held:

> an emergency department's policies or procedures
> concerning the provision of discharge instructions (i.e.,
> what occurs after the emergency screening has been done
> and emergency services have been provided) are not
> within the scope of an emergency screening policy for
> purposes of EMTALA.

Joint Appx. at 183-84.

The district court's holding is in accord with other jurisdictions that have

addressed the issue of whether actions taken by a hospital, after it determines that

08391/2/01013515.DOCXv1                    32

no emergency medical condition exists, may give rise to a failure to screen claim under EMTALA.  For example, in *Slabik v. Sorrentino*, 891 F. Supp. 235 (E.D. Pa. 1995), *aff'd* 82 F.3d 406 (3d Cir. 2006) (unreported), the plaintiff alleged that the emergency room physician failed to instruct her on how to obtain care should her condition not improve.  *Id.* at 237-38.  The court explained that such an allegation did not give rise to a failure to screen claim under EMTALA because

> [t]he purpose of a § 1395dd(a) screening is to determine whether an emergency medical condition exists.  Once an emergency medical condition is found not to exist, the duties of § 1395dd(a) do not extend further.

*Id.* (internal citation omitted).  *See also Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 498 (S.D. Tex. 2009), *aff'd* 409 Fed. Appx. 769 (5th Cir. Feb. 1, 2011) (unreported) ("The aftercare and follow-up policy is not an EMTALA screening policy. . . .  [Accordingly,] [e]vidence of a violation of the aftercare and follow-up care policy does not raise a fact issue as to an EMTALA violation."); *Feighery v. York Hosp.*, 59 F. Supp. 2d 96, 106 n.10 (D. Me. 1999) ("The crux of a section 1395dd(a) claim is to determine whether a hospital provided 'an appropriate medical screening examination' that will 'determine whether or not an emergency medical condition' exists.  *See* 42 U.S.C. § 1395dd(a).").

Appellants fail to offer any evidence indicating that Frederick Memorial's policies concerning written or oral discharge instructions are part of the medical screening procedures used by Frederick Memorial to determine the existence of an

emergency condition.  Such evidence is necessary, the district court recognized,

because "the discharge instructions were provided to K.J. after the discharge

determination was made by P.A. Taliaferro and the connection between providing

discharge instructions and screening for an emergency condition is not apparent."

Joint Appx. at 185, n.16.  Accordingly, the district court correctly found that

Appellants' allegation that Frederick Memorial failed to provide Mrs. Jimenez with

discharge instructions in Spanish does not give rise to a claim under EMTALA but

relates solely to Appellants' medical malpractice claim.  Joint Appx. at 186.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the

United States District Court for the District of Maryland.

Respectfully submitted,

| | |
|---|---|
| ___/s/___ M. Natalie McSherry___ | ___/s/___ Conrad W. Varner____ |
| M. Natalie McSherry | Conrad W. Varner |
| Mary Beth Ewen | Matthew H. Fogelson |
| KRAMON & GRAHAM, P.A. | Frederick W. Goundry, III |
| One South Street, Suite 2600 | VARNER & GOUNDRY |
| Baltimore, Maryland  21202-3201 | 121 East Patrick Street, Suite 100 |
| nmcsherry@kg-law.com | Frederick, Maryland  21701 |
| mewen@kg-law.com | cvarner@vglaw.com |
| Tel.: (410) 752-6030 | mfolgelson@vglaw.com |
| Fax: (410) 539-1269 | foundry@vglaw.com |
| | Tel.: (301) 631-1800 |
| *Counsel for Appellees* | Fax: (301) 631-9234 |
| *Frederick Memorial Hospital, Inc. and* | |
| *Frederick Memorial Healthcare System* | *Counsel for Appellees* |
| | *Robert C. Taliaferro, PA-C, and* |
| | *Emergency Physician Associates, P.A.* |

## <u>STATEMENT WITH RESPECT TO ORAL ARGUMENT</u>

Appellees respectfully suggest that oral argument is not necessary in this case. The legal issues are not novel, and oral argument would not aid the Court in reaching its decision.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.     This brief comports with the type-volume limitation of Rule 32(a)(7), Fed. R. App. Proc., because this brief contains 8,132 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.     This brief comports with the typeface requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word 2007.


_____/s/_____
M. Natalie McSherry

Dated:  November 9, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2011, I caused the Brief of Appellees Frederick Memorial Hospital, Inc., Frederick Memorial Healthcare System,  Robert C. Taliaferro, PA-C, and Emergency Physician Associates, P.A. to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

> Thomas C. Cardaro, Esquire
> Jeffrey L. Peek, Esquire
> C. Drew Fritch, Esquire
> Cardaro & Peek, LLC
> 201 North Charles Street, Suite 2100
> Baltimore, Maryland  21201
>
> Attorneys for Appellants

I further certify that on this 9th day of November, 2011, I caused eight copies of the Brief of Appellees Frederick Memorial Hospital, Inc., Frederick Memorial Healthcare System,  Robert C. Taliaferro, PA-C, and Emergency Physician Associates, P.A. to be sent by Federal Express to the Clerk's Office of the United States Court of Appeals for the Fourth Circuit.

_____/s/_____
M. Natalie McSherry